# The Louisville Property Co., et al. v. Commonwealth.

(Decided February 8, 1912.)

## Appeal from Todd Circuit Court.

1. Cross Appeal—Escheat—Action to Escheat—Property of Corporation—Question Whether Needed or Used in Conduct of its Business During the Five Years Next Preceding Action to Escheat—Railroads—Maintaining Hotel to Supply Meals for Employes and Passengers.—Wherever the question has arisen it has uniformly been held that it is not only the right, but the duty of a common carrier to make suitable provision for providing meals for its passengers and employes at seasonable hours and proper places, and if a railroad company may carry a diner in connection with its train, and for hire, feed the passengers thereon, no good reason is perceived why it may not with equal propriety, provide suitable hotel or restaurant accommodations for its passengers and employes for hire. This is an incident to the proper conduct of its business. Therefore, in an action to escheat certain property of a railroad company so occupied, on the ground that it was held and used in violation of Section 192 of the Constitution, and Section 567 of the Kentucky Statutes, it was not error in the trial court to hold that it is not subject to escheat.

2. Same—Right of Railroad to Maintain Park—Legitimate and Proper Use of Land.—While the right of a railroad company to hold a tract of land for a park presents a new question, it is a custom of railroads generally to convert small and unoccupied tracts of land, into miniature parks and beautify them by planting shade trees, flowers and laying walks through them. In this way the pleasure of the passengers is added to and recreation and rest provided for them and the company's employes. No profit to the company is derived in this way, and viewed in this light such use of a tract of land is legitimate and proper. It is a commendable use, and the Commonwealth should encourage, rather than try to prevent small parcels of land from being converted into parks. In order to justify such use however, the land must lie near the depot, and must be reasonable in size, taking into consideration the uses to which it is to be put.

3. Implied Powers.—Indeed, in the maintenance of a place for hotel or restaurant accommodations, and for pleasure, recreation and rest, such as is afforded by a park, neither the letter nor the spirit of the Constitution or statute is violated, but the railroad company acts in the exercise of certain implied powers which it is not prohibited to exercise.

PENJAMIN D. WARFIELD, SELDEN Y. TRIMBLE, C. H. MOORMAN and PERKINS & TRIMBLE for appellants.

GEO. F. PICKETT, C. G. BARRIEMAN, BEARD & MARSHALL and S. WALTON FORGY for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming on cross appeal and reversing on original appeal.

In this suit the Commonwealth sought the escheatal of certain property owned by the Louisville & Nashville R. R. Co., on the ground that it had not been needed or used in the conduct of its business during the five years next preceding the date upon which the suit was instituted. The company denied that it was subject to escheat. Upon this issue the case was tried, with the result that the court held part of the property subject to escheat and certain other portions thereof not so subject. Both parties are dissatisfied with the judgment. The railroad company prosecutes this appeal, and the Commonwealth a cross-appeal.

The property in question consists of seven tracts of land, lying along the railroad right-of-way at Guthrie, Kentucky. All of this property was sold at master commissioner's sale on June 25th, 1902, and the railroad company became the purchaser thereof. For reasons of its own, but which are not material to the determination of the issues here, it caused the title thereto to be placed in the Louisville Property Company; but it is made clearly to appear, that while the title was held by the Louisville Property Company, it was in fact paid for and owned by the Louisville & Nashville Railroad Co.

The Central Trust Co. of New York had a mortgage upon this property and it was made a party. It set up and asserted a lien upon the property to secure and satisfy its mortgage debt.

From the conclusion which we have reached it is necessary to consider but one question upon this appeal, to-wit, whether or not, in purchasing and holding this property for more than five years, under the circumstances developed by the evidence in this case, the railroad company has violated section 192 of the Constitution and section 567 of the Kentucky Statutes, enacted for the purpose of carrying into effect this constitutional provision.

At Guthrie, the Memphis branch of the Louisville & Nashville Railroad crosses the Henderson branch, at approximately right angles, and the location of these several tracts of land in controversy is shown by the accompanying map. Tracts one and two adjoin, and are, in fact, one body or tract of land, lying at the northwestern intersection of these two roads. Tract three occupies the southwestern intersection, tract four, the

southeastern intersection, and tract five the northeastern intersection. The Memphis branch runs nearly north and south, and the Henderson branch east and west. The depot is built on tract three; and a hotel is built upon tracts one and two, near the intersection of the roads and just north of the depot. An arm of a "Y" connecting these roads passes over the northwest corner of tracts one and two. Another arm of a "Y" connecting these roads passes over the northeast conner of tract five. Tract four is a park, with shade trees, walks, a pool and a fountain therein. It lies just across the track of the Memphis road from the depot, and near the hotel property. Tract eight lies south of the depot, and is crossed by an arm of a "Y" which has been double-tracked. Tract nine lies east of the Memphis track and south of the Henderson track, and had not been used by the road for any purpose at the date of the institution of this suit, unless a track had been laid on it near the coal bin and chute, designated on the map by the letters D, E, F and G. Tract nine is the only one of any considerable size, and it contains about eighty acres. The lower court held that tract one, two, three, four, five and eight were not subject to escheat, and that tract nine was.

It is not seriously contended on this appeal that the court was in error as to tracts three, five and eight, as it is shown that each of these had been actually used by the railroad exclusively in connection with its business. But it is earnestly insisted that the court was in error in holding that tracts one, two and four were not subject to escheat; and the company seeks a reversal of the court's ruling as to tract nine. Tracts one and two are used by the company in exactly the same way as are tracts five and eight, i. e., one arm of a "Y" is run across them. If this was the only use to which they were subjected, it is doubtful if the Commonwealth would insist upon a reversal as to this tract. But because it has a large hotel upon it, which is rented out by the company for $1,800 a year, it is urged that a different rule should be applied to it from that applied to tracts three, five and eight. The railroad company insists that it is compelled to maintain and operate, or have operated, a hotel at this point for the accommodation of its employes and passengers. Guthrie is shown to be an important railroad center. As many as eighty trains pass

in and out of there every day. Many of the crews who operate these trains change there, and at least three hundred men in the employ of the company are compelled to eat there daily; and many of them must be provided with some suitable and convenient place to sleep. So that the company insists that it is absolutely indispensable to the proper conduct of its business that suitable accommodations be provided for its employes at that place. That not only is this so, but that many passengers on its through trains, upon which diners are not carried, are daily fed there. That it is required to provide, not only for the care of the passengers, but for their comfort, and that the right of a railroad to provide for the comfort of its passengers, in the way of furnishing meals at suitable and seasonable hours, is universally recognized.

Combating this idea, that the hotel is a necessary adjunct to the successful operation of its road, it is urged that section 210 of the Constitution expressly prohibits a common carrier from engaging in, owning, operating or managing, directly or indirectly, any business other than that of a common carrier, and that section 192 of the Constitution prohibits a corporation from engaging in any other business than that expressly authorized by its charter; and that section 567 of the Kentucky Statutes prohibits any corporation from engaging in any business other than that expressly authorized by its articles of incorporation and amendments thereto; and hence no plea of necessity can be used to override these plain provisions of the Constitution and Statutes. That, as no authority is given any railroad to run a hotel, it is without power to do so, and the use to which it puts tracts one and two is an unauthorized use, and hence no use at all.

Neither the provisions of the Constitution nor the provision of the statutes quoted have heretofore been given so strict or narrow a construction as counsel for appellee would have applied. On the contrary, wherever the question has arisen, courts have held, not only that it was the right, but the duty of a common carrier to make suitable arrangements for providing meals for its passengers and employes at seasonable hours and proper places. The dining car upon through trains is looked upon, not as a luxury, but as a necessity; and if a railroad may carry a diner in connection with its train, and for hire feed the passengers thereon, we see

no good reason why it might not, with equal propriety, provide suitable hotel or restaurant accommodations along its road to meet a similar necessity. In either case the company is engaged in furnishing food for its passengers and employes for hire. This is an incident to the proper conduct of its business. In Hutchinson on Carriers, section 611, the author thus states the generally accepted rule as to the duty of a common carrier to provide refreshments for its passengers:

"The carrier is also required, where the length of the journey makes it necessary, to allow the customary intervals, and at the usual places, for refreshment of his passengers; and such usages can not be varied at his pleasure or caprice; for every passenger is understood to contract for the usual reasonable accommodations of this kind, and they may have been the reasons for preferring his conveyance to the less convenient arrangement of another carrier."

It may be argued that, while it is the duty of the carrier to stop at suitable intervals to allow the passengers to refresh themselves, it is not the duty of the company to furnish these refreshments. This argument is well answered by Wood on Railroads, volume 1, section 170, in which he says:

"There is no question but that railroad corporations have, as auxiliary or incident to their main or authorized business, all the powers which an individual would have under the same circumstances; and the extent of these powers is to be determined, not only by reference to the express powers conferred by the charter, but also to the nature, extent, and necessities and conveniences of the business and of the public. They have the power to take and grant property, and assume obligations, in the same manner that an individual might, for the construction of their road, and for supplying it with the necessary machinery, appliances and conveniences for the conduct of their business in all its departments. Thus, it has been held that a railroad company may erect a telegraph along its roadway, as incidental to its primary business. So it has been held that it may put up refreshment rooms along the line of its road for the convenience of passengers; and undoubtedly instances might arise where it would have authority to put up hotels upon the line of the road for a similar purpose, where the interests of the corporation and the traveling

public require it. This is upon the principle that a corporation has, in addition to its special powers, implied authority to do all acts necessary for the full and complete utilization of its special powers which are not expressly or impliedly excluded by the terms of the grant. Thus, a railroad company has, as incident to its business, the right to engage in the cartage of goods to and from its depots.''.

The right of a railroad to establish refreshment stands or hotels at proper and necessary places along its line of road is one of its implied powers, as was expressly decided by the Supreme Court of Appeals of Virginia, in National Car Advertising Co. v. Louisville & Nashville R. R. Co., 110 Va., 413, where it is said:

''In the brief of plaintiff in error many illustrations are given of contracts upheld by the courts which were not strictly within the express powers conferred by the charter; but in all the authorities cited in support of that proposition, whether of adjudicated cases or from text-writers, we think it will be found that the implied power was one in aid of an express power, and which inured to the good of the general public.

''The illustrations given in Wood on Railroads, at section 170, that a railroad company may erect a telegraph line along its railway, as incidental to its primary business; that it may put up refreshment rooms along its line of railroad for the convenience of passengers, or hotel for a similar purpose, where the interests of the corporation and the traveling public require it, belong to this class.''

The duty of a railroad company to furnish suitable refreshments for its passengers and employes at proper intervals along the line of its road, and their implied power, as an incident to this duty to maintain hotels or restaurants at suitable places along its line, is recognized by the Interstate Commerce Commission, as appears from an inspection of rule 87, as promulgated by that body, dealing with the subject of eating houses operated by or for carriers. This rule provides:

''87. TRANSPORTATION FOR, EATING HOUSES OPERATED BY OR FOR CARRIERS. Carriers subject to the act may provide at points on their line eating houses for passengers and employes of such carriers, and property for use of such eating houses may properly be regarded as necessary and in-

tended for the use of such carriers in the conduct of their business.''

In harmony with the text and authorities quoted are the decisions of the Supreme Court of Illinois in State v. Illinois Central Railroad Co., 246 Ill., 188; Chicago, Milwaukee & St. Paul R. R. Co. v. Supervisors, 48 Wis., 666; Abraham v. Oregon & California R. R. Co., 37 Ore., 495, and State v. Baltimore & Ohio R. R. Co., 48 Md., 49. In each of these cases the principle is recognized that the railroad company, where given certain specific rights and powers under its charter, has certain other implied powers, which are found to be necessary in order to properly and successfully carry out the purposes for which it was organized and created.

The Supreme Court of the United States in Jacksonville, et al. v. Hooper, 160 U. S., 514, had before it the right of a railroad to lease, maintain and operate a hotel, when its charter did not, by express provision, authorize it to do so. In holding that it might, under its implied power, exercise such right, the court said:

''We do not seek to relax, but rather to affirm the rule laid down by this court in Central Transp. Co. v. Pullman Palace Car Co. (above cited) that 'a contract of a corporation, which is ultra vires, in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and, therefore, beyond the powers conferred upon it by the Legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is not merely that the corporation ought not to have made it, but that it could not make it. Such a contract can not be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it. 139 U. S., 59, 60. (35, 68, 69.)

''But we think the present case falls within the language of Lord Chancellor Selborne in Attorney General v. Great Eastern R. Co. (L. R.), 5 App. Cas., 478, where, while declaring his sense of the importance of the doctrine of ultra vires, he said: 'This doctrine ought to be reasonably, and not unreasonably, understood and applied, and that whatever may be fairly regarded as incidental to, or consequential upon, those things which the Legislature has authorized, ought not, unless expressly prohibited, to be held, by judicial construction, to be ultra vires.' In the application of the doctrine the

court must be influenced somewhat by the special circumstances of the case. As was said by Romily, M. R., in Lyde v. Eastern Bengal R. Co., 36 Beav., 10, where was in question the validity of a contract by a railway company to work a coal mine: 'The answer to this argument appears to me to depend upon the facts of each particular case. If, in truth, the real object of the colliery was to supply the railway with cheaper coals, it would be proper to allow the accidental additional profit of selling coal to others; but if the principal object of the colliery was to undertake the business of raising and selling coals, then it would be preversion of the funds of the company, and a scheme which ought not to be permitted, however profitable it might appear to be. The prohibition or permission to carry on this trade would depend on the conclusion which the court drew from the evidence.' * * *

"The contract between the parties hereto was for leasing a hotel at the terminus of the railroad, situated at a beach, distant from any town. If not fairly within the authority granted by the statute of Florida 'to erect and maintain all convenient buildings * * * for the accommodation and use of their passengers,' it certainly can not be said to have been forbidden by such laws. Nor can it be said to have been, in its nature, contrary to public policy.

"To maintain cheap hotels or eating houses, at stated points on a long line of railroad through a wilderness, as in the case of the Pacific railroads, or at the end of a railroad on a barren, unsettled beach, as in the present case, not for the purpose of making money out of such business, but to furnish reasonable and necessary accommodations to its passengers and employes, would not be so plainly an act outside of the powers of a railroad company as to compel a court to sustain the defense of ultra vires, as against the other party to such a contract."

The proof in this case shows that the hotel property cost the company more than $30,000, and that it spent annually in taxes and repairs upon the hotel building the larger part of the rental derived therefrom, so that it can not be said that it is running it for profit. On the contrary, the evidence fully justifies the allegation that it is held and maintained solely for the benefit of the public traveling on its trains and such of the employes of appellant as are, from the nature of their duties, re-

quired to take their meals and sleep there at Guthrie.
Nor is this all. It appears that, under the contract of
lease, the toilets and waiting rooms of the hotel are for
the special use of the lady passengers stopping at Guth-
rie; and a temporary hospital is provided for in one of
the rooms of the hotel. The building being under the
control of the company, it is in a position to see that the
wants of the passengers and employes are properly sup-
plied; and while there is some evidence that the prices
charged are high, they are not out of proportion to the
accommodations furnished. Considering the needs of
the place and the character of the use to which this hotel
property is put, we are satisfied that the court did not
err in holding that these tracts were not subject to es-
cheat.

The right of the railroad to hold tract four as a park
presents a new question. We are furnished no author-
ity by counsel for either side, nor have we been able to
find any bearing upon this question. And yet we know
that it is a custom of railroads generally, and par-
ticularly the great transcontinental lines, to convert the
small, unoccupied tracts of land lying adjacent to and
near their depots into minature parks, and beautify
them by planting shade trees, flowers and shrubbery,
and laying walks through them, and frequently, as in the
present case, building pools and putting fountains
therein. The very fact that this custom has so univer-
sally obtained is suggestive that it has not been re-
garded as violative of the rights of the company so to
do. Unquestionably, in this way the company adds to
the pleasure of its passengers, and frequently to the
comfort, both of its passengers and employes, for these
parks are not only pleasing to the eye, but they add ma-
terially to the comfort of passengers and employes wait-
ing for the arrival and departure of trains, by affording
them a place for recreation and rest. The statutes re-
quire that the company shall provide suitable and con-
venient waiting rooms at all depots for the accommoda-
tion of passengers. The object in view is the comfort
of the traveling public, and the more perfectly the
wants, needs and interests of the traveling public are
provided for, the more popular the road becomes as a
common carrier. The maintenance of the park is in no
wise profitable to the company. On the contrary, it is
a source of constant expense. It can serve no possible
purpose, except to add to the attractiveness of the depot

and its surroundings and to the comfort of the employes and passengers of the company who are required to be and remain at the depot. Viewed in such light, this is a proper and legitimate use of tract four by the company, and following the example of the national and State governments and the various municipal corporations throughout the country, which annually spend many millions of dollars in the purchase, building and maintenance of parks, it is a most commendable use, and the Commonwealth should encourage rather than try to prevent railroads from thus converting small parcels of ground, lying adjacent to their depots, into parks.

Co-extensive with the custom of railroads to build and maintain parks at and near their depots, is that of building and keeping Y. M. C. A. rooms at points along the line of their road where their employes are required to congregate in numbers. These buildings are enacted solely for the benefit of the employes of the company. The ground upon which these buildings are erected is not, in the strict sense of the word, used by the railroad in connection with, or in the conduct of its business, and yet it would hardly be urged that the ground upon which these various Y. M. C. A. buildings are erected, at great cost to the railroads, is subject to escheat. We think it is not; but the contention that it is could be made with as much force as the contention is that the parks are thus subject to escheat, for the purpose of building and maintaining each is to add to the comfort of the traveling public and the employes of the railroad. Since it is not maintained by the road for profit, but solely for the purposes above indicated, we hold that, as long as tract four is maintained as a park, it is being used by the company for a purpose connected with the proper conduct of its business, and hence not subject to escheat.

In order to justify a railroad to hold land for park purposes two things must concur: First, the land so held must lie at or near the depot, so as to be of easy access to its passengers and employes; and second, it must be reasonable in size, taking into consideration the extent of travel to and from such depot and the number of employes whose duties require them to be there. In other words, the park must be in keeping with the size of the place and other accommodations and conveniences furnished by the railroad at that point. If these two nec-

essary prerequisites are complied with, neither the letter nor the spirit of the Constitution or statute will be violated.

If we felt less certain of our position upon this point, there is another good and sufficient reason why tract four is not subject to escheat. As stated, it lies at the junction of these two roads, immediately in front of the hotel property and the depot. Any additional trackage that it might be necessary for the road to have at that point would have to be made, either behind the depot, or parallel with the present roadbed over a part of tract four. The evidence shows, and the physical facts demonstrate, that this is the only ground at that point available for additional trackage, and that it will, sooner or later, be required by the increasing business of the company at that point.

This leaves for our consideration only tract nine. The law applicable to this case was thoroughly settled by this court in the recent case of German Insurance Co. v. Commonwealth, 141 Ky., 606. The rule covering the right of a corporation to hold property longer than five years was there tersely stated thus:

"We do not think that a corporation is in all cases to be deprived of its real property merely because it has owned it for more than five years, without applying it to some proper or necessary use in connection with its business. The purpose of its acquisition, the intention with which it is held, and the use to which it may be and is designed to be put, are to be considered in connection with the time of the holding in determining whether or not the provision of the Constitution has been violated. * * *

"A corporation organized for business purposes, and with the power to carry on business enterprises, should be allowed the same liberty within the scope of its charter rights and subject to the limitations imposed by law as would be permitted to an individual engaged in a similar business. It is not the purpose of the Constitution or the law to place in the way of the success of corporations unreasonable obstacles or to hinder them from acting as prudent business men would act under like or similar circumstances. Having this view of the privileges that corporations should enjoy, we do not think the Constitution should be so construed as to deny a corporation the opportunity to look forward to the time when its needs in the conduct of its business will

be greater than at present or to deprive it of the right to prepare in advance for conditions that it may reasonably expect will come up in the future. If a corporation was not allowed to carry into execution plans that the good judgment of its officers believe to be essential to its growth and prosperity, it would discourage people from investing their money in these agents that are so indispensable to the business of the State and country. From these considerations and others that might be mentioned, we conclude that the time limitation imposed by the Constitution was not intended to deny a corporation the right in good faith to acquire real estate for a proper and necessary future use in the transaction of its legitimate business, and hold the same for a longer period than five years, if it is so held with the intention in good faith of devoting it to a proper and necessary use and it will be necessary for such purpose when so used. It is not so much the time for which real estate is held but the purpose for which it was acquired, the intention with which it is held, and the use to which it is to be put and the necessity for this use, that determines the right of the corporation to hold it.''

Applying this rule of law to the facts in the case before us, we find that in 1902 the railroad company bought these seven tracts of land for use in connection with its business. Up to the time of the filing of the suit five of them had been subjected to the use for which they were purchased, the sixth had been converted into a park, and the testimony is clear and convincing to the effect that the seventh tract, which is tract No. 9, is absolutely essential to the proper conduct of the company's business at that point, in order that it may have additional trackage and another ''Y'' connecting these two railroads. That it was bought to meet the needs of the company, there can be no doubt. There is not an intimation in the record that the company had any other object in view in purchasing it. It is not coal, or mineral, or timber, or valuable agricultural land. On the contrary, it appears from the record that part of it is swampy, and before tracks can be laid upon it the company will be put to the necessity of removing the land from the higher ground to the lower or swampy portions. The company has attempted to make no other use of it. The

proof shows that the improvement of this land for railroad purposes has simply been delayed because of press of other business or lack of means. The vice president of the company and the superintendent of each of the divisions of the road crossing at that point testify that it is needed; and the lay of the land, its proximity to each line of road, the increased and still increasing business at that point, are circumstances giving weight to their testimony to the effect that it is so needed.

It is argued by counsel for appellee that, at most, but a part of tract No. 9 is needed for additional railroad facilities at that point. The answer to this contention is that the evidence shows that it is needed, and the Commonwealth offered no evidence to refute or rebut this evidence. It is not enough to show that a great many tracks, if built side by side and parallel to the present roadbed, could be built upon this piece of land, and argue from this that it is not all needed. In running its "Y" from the Henderson branch to the Memphis branch, on account of the tract I-H-J-K being owned by others than the railroad, it would be necessary for the company to start upon the Henderson branch at some point between the letters N and A, as shown on the map, and run on a line parallel with the coal bin or chute, or even beyond, to the point C. Hence, if additional side or passing tracks or storage tracks are to be built upon this land, they would have to be made branches of the "Y." Viewed in this light, it would be impossible to say or determine what part of tract No. 9 would be required to meet the needs of the company. Under such circumstances we are unwilling to speculate, but must decide the case on the evidence before us, which is to the effect that the entire tract is so needed. The trial court erred in holding it subject to escheat.

For the reasons indicated the judgment on the original appeal is reversed, and, on the cross-appeal, affirmed.

Whole court sitting.

Judge Nunn dissenting.

___

Dissent of Judge Nunn:

I dissent from this opinion in so far as it reverses the appeal. The railroad has owned this 70 or 80 acres of land for eight or nine years and has not attempted to

use it, and it is not a defense to say that they will need it in the future in their business. To uphold such a defense destroys the purpose and effect of the provision of the Constitution and Statute in regard to escheat.