DULUTH, SOUTH SHORE & ATLANTIC RAILWAY CO. *v.* WILSON.

1. CONTRACTS—ASSIGNMENTS—PUBLIC POLICY—CUSTOMS BROKER— ASSIGNMENT OF FEES.

There are no questions of public policy involved which would affect the right of a customs broker to make an assignment of the fees to be received therefor; the duties being of a private nature.

2. SAME—MASTER AND SERVANT—RIGHT OF MASTER TO EARNINGS OF SERVANT.

In view of the general rule that all the time and labor of an employee belongs to his employer during the hours of

service, and that the master is entitled to the earnings of the servant earned outside his employment during such hours, an express contract to that effect is valid and enforceable.

3. SAME—MASTER AND SERVANT—RAILROADS—ASSIGNMENTS—PUBLIC POLICY.

A contract between a railroad company and a clerk employed in its freight office, by which said clerk agreed to remit to the company all fees received by him as a customs broker, in consideration of his receiving a fixed salary, he acting in such capacity for the purpose of facilitating the company's freight service, *held*, not void as against public policy.

4. SAME—PUBLIC OFFICERS—ASSIGNMENT OF SALARY.

If said contract be considered an assignment, *held*, not within the exception made in the salaries of public officers and certain fiduciary officers, and therefore valid.

5. SAME—CORPORATIONS—ULTRA VIRES.

The doctrine of *ultra vires* cannot be applied to contracts not prohibited, either expressly or by necessary implication, in the statute.

6. SAME—PLEADING—APPEAL AND ERROR.

The defense of *ultra vires* is not available unless specially pleaded.

7. SAME—ESTOPPEL—PERFORMANCE—ULTRA VIRES—PUBLIC POLICY.

Where a contract has been fully performed on the one side, and no question of public policy is involved, the other party is estopped from setting up the defense of *ultra vires*.

8. SAME—RAILROADS—CUSTOMS BROKERS—ASSIGNMENT OF FEES—PERFORMANCE—ESTOPPEL—ULTRA VIRES.

Where a railroad company entered into a contract with a clerk employed in its freight office whereby said clerk was to act as a customs broker for the purpose of facilitating its freight service, and he in return for a fixed salary, which was increased from time to time, agreed to remit the fees received by him as such broker to the railroad company, and the company performed its part of the contract for six years, and until the termination of the employment, defendant is estopped from claiming that the contract was *ultra vires*, in an action to recover part of the fees not remitted in accordance with said contract.

Error to Chippewa; Fead, J.  Submitted January 24, 1918.  (Docket No. 171.)  Decided March 21, 1918.

Assumpsit by the Duluth, South Shore & Atlantic Railway Company against Edmund Wilson for brokerage fees received while in plaintiff's employ.  Judgment for plaintiff.  Defendant brings error.  Affirmed.

*M. M. Larmonth,* for appellant.

*Warner & Sullivan* (*Ralph R. Eldredge,* of counsel), for appellee.

STONE, J.  Action to recover the amount which defendant had retained of fees as customs broker, while in plaintiff's employment as chief clerk at Sault Ste. Marie.

The declaration consisted of the common counts in assumpsit, and the plea was the general issue with a notice of set-off.  The facts were stipulated, and counsel for the respective parties agreed, in open court, that there being no question of fact to submit to the jury, the trial court should direct a verdict and judgment to be entered, as might be determined.  Briefly stated, the facts as stipulated were as follows:

The plaintiff maintains a local freight agent at Sault Ste. Marie, Michigan, and a freight office jointly with the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, in which defendant was employed as chief clerk for many years prior to January 15, 1915.  On February 21, 1907, plaintiff's local freight and passenger agent at Sault Ste. Marie, Michigan, (Col. Frank E. Ketchum) died, and thereafter the positions of local freight and passenger agents were separated, and Garret Gilbert was appointed the freight agent and yardmaster in charge of the plaintiff's freight business at this point.  Large quantities of freight are daily received by the plaintiff over the

Canadian Pacific lines and across the International
bridge from Canada for transportation to various
points in the United States over the lines of said two
railway companies; and it has been the custom of
plaintiff, to a very large extent, to facilitate such ship-
ments, to have its local freight agent or chief clerk
act as customs broker.

Up to the time of the death of Col. Ketchum he per-
formed this service, and as part of the compensation
paid him he was to, and did retain the fees therefor.
The defendant was at this time clerk in the plaintiff's
freight office at Sault Ste. Marie, Michigan, and was
paid a fixed and certain salary for his services. He
was also recognized as the customs broker from and
after February 12, 1907, turning over the fees col-
lected for this service to Col. Ketchum from time to
time. On the appointment of Mr. Gilbert as local
freight agent of the plaintiff, on March 1, 1907, fol-
lowing the death of Col. Ketchum, the defendant con-
tinued to act as customs broker, and the fees for such
services were collected and remitted from time to time,
with a record of the entries made, to the treasurer of
the plaintiff at Marquette, Michigan, and report of the
same was sent by defendant to plaintiff's auditor.

Gilbert chose to accept a fixed and certain salary of
$175 per month for his services, and thereafter all
fees collected were to be remitted to the plaintiff's
treasurer, these remittances to be made, from time to
time, in the name of Garret Gilbert, per Edmund
Wilson, to which the defendant agreed under the cir-
cumstances hereinafter set forth.

Up to and including November, 1914, monthly state-
ments purporting to show all entries made and fees
collected therefor were sent to the plaintiff's auditor
at Marquette, Michigan, and remittances for each of
such monthly statements were sent to the plaintiff's
treasurer at Marquette.

The necessary blanks for the conduct of such business were purchased by the defendant from the collector of customs of the district and the cost deducted from remittances to plaintiff's treasurer, and the reports to plaintiff's auditor show the number of blanks and the cost of each, excepting in two instances where there was a shortage of blanks in the collector's office and the defendant procured two orders for blanks, amounting to $18, from a local printing company, no charge being made to the plaintiff and no deduction being made from the fees collected. Later, and during the year 1914, blanks were furnished on requisitions from the defendant.

At the time the local freight agent, Mr. Gilbert, was appointed, Mr. Fitch, who was then president of the plaintiff company, and Mr. Gilbert went to the freight office where defendant was employed, and defendant was advised by Mr. Fitch that all the customs brokerage work formerly done by Frank E. Ketchum would, in the future, be the work of the defendant; and, because Garret Gilbert was getting a fixed salary for his work, the fees for such customs brokerage work would be remitted to the railway company. These remittances were to be made by the defendant in the name of Garret Gilbert, the local freight agent, and were to be remitted as received, and defendant promised to remit such fees as were earned by him as customs broker, and this agreement has never been changed.

The defendant Wilson was appointed chief clerk and cashier of the plaintiff company on January 6, 1907, at a salary of $90 per month. In February, 1907, he was relieved of the position of cashier, C. E. Barney being appointed to that position, and the defendant continued to act as chief clerk at $90 per month.

A short time later the defendant applied to Mr. Gilbert for an increase in salary, because the duties of Mr. Gilbert as yardmaster took so much of his time

away from the office that it necessitated much additional work for the defendant, and Mr. Gilbert, the local freight agent, recommended to Mr. Fitch, who was then president of the plaintiff, that defendant's salary be increased to $100 per month, owing to the fact that, together with his ordinary and usual duties, he was required to work longer hours than if he were not compelled to do this work and defendant's salary was raised to $100 per month, and continued at this figure for some years, being subsequently raised so that at the time he ceased to be an employee of the plaintiff his salary was $105 per month.

The government did not exact a fee for licensing brokers, and there was no fee or other charge under the act of congress of 1894, and defendant was first appointed customs broker on February 12, 1907, because of the illness of the local freight agent, and defendant had been for some little time making entries and signing the name of Col. Ketchum to the same, and the customs officials at said port refused to longer accept entries of this character.

After the act of 1910 providing for licensing of customs brokers, defendant was, on August 10, 1910, licensed by the United States government as customs broker and continued said work. Under this act no fee was exacted by the government for customs brokers.

The act of October 22, 1914, provides that on and after November 1, 1914, customs brokers shall pay an annual tax of $10. This tax, amounting to $6.70 from November 1, 1914, to July 1, 1915, was paid by the defendant and charged to the plaintiff by deducting the amount from his statement of fees collected for November, 1914.

The total amount of the shortage up to the time the defendant ceased to be in the employ of plaintiff was $560.60, which sum is made up of the fees collected as

customs broker by defendant from and after December 1, 1914, and the amount the defendant from time to time ˙kept out of his remittances prior thereto, when he was reporting smaller amounts than actually collected. Up to and including June, 1913, defendant remitted the actual amounts received from such fees.

Defendant was in the employ of the plaintiff as clerk at the transfer station and freight office about 21 years, resigning his position about the middle ˙of January, 1915. At the time he left the company's service it refused to pay him his last month's salary, amounting to $105.

There has been collected and paid over to the plaintiff in brokerage fees earned by the defendant, from March 1, 1907, to the time defendant resigned his position as chief clerk, the sum of $8,984.50.

This action was begun to recover the amount which defendant had retained, and the counter claim was for the amount of fees which had been remitted to the plaintiff.

It is the claim of the plaintiff that by reason of this arrangement it was entitled to retain and have the fees earned by the defendant. On the other hand, it is the claim of the defendant that as he was the customs broker, he was entitled to the fees' which he had earned, and is entitled to recover from the plaintiff the sum of $8,984.50, together with his month's salary amounting to $105, and interest on the same.

The trial court directed a verdict in favor of the plaintiff for $457.92, which sum was determined by deducting from the fees retained by defendant ($560.60), his salary of $105 and blanks paid for by him of $18, amounting to $123, which sum being deducted left the amount of $437.60, to which was added interest, $20.32.

The trial court, in its charge directing a verdict among other things, used the following language:

"From the statement of facts, it is evident that the plaintiff is entitled to a verdict unless the contract, by which the defendant agreed to pay the plaintiff the fees earned by him as a customs house broker, is invalid and unenforceable. Defendant's first contention is that a customs house broker is an officer of the United States, and the contract, being for the assignment of official fees, is void as against public policy. There is no merit in this contention. A customs house broker is not an officer of the United States. He is not appointed by the President, a court of law, nor the head of a department, *i. e.*, a member of the cabinet (citing the Constitution of the United States and authorities). He is neither elected nor appointed. He exercises his rights by virtue of a license, which is not an investiture of government functions, but the granting of a privilege.

"The act under which he is licensed, negatives any idea of official character:

"(*a*) By providing that any citizen of good moral character is entitled to a license. Officers are not so self-constituted.

"(*b*) By providing for the licensing of copartnerships and corporations as such. A corporate public officer would be an innovation.

"He is invested with no part of the sovereign functions of the government. He is the agent of the importer and deals with the government in that capacity. Moreover, his duties are not analoguus to those of an executor or administrator. * * * He may act for whom and so far as he pleases. The license merely gives him the privilege of entering the goods for those who choose to employ him and for whom he chooses to perform such service."

"Defendant also contends that the contract was without consideration, there being no new consideration in the way of an increase of salary or position moving to defendant. It could hardly be contended that an increase of duties without a corresponding increase of salary would render the extra work imposed without consideration, and give a right of action for overtime. If so, employers would be unable to change work or add duties to employees without being liable for additional compensation. The continuation of the em-

ployment is a sufficient consideration for all duties imposed upon an employee, in the absence of agreement or custom allowing overtime, and is certainly sufficient consideration when an express agreement is made to that effect. In any event the relief from the duties of cashier would be a valid and sufficient consideration for the contract at bar.

"Defendant also contends that the contract was *ultra vires* the plaintiff, (*a*) because the plaintiff would not be licensed as a customs broker, and (*b*) because the contract was not within the powers of a railroad corporation. * * * The contract at bar contains no engagements on the part of the plaintiff to do any act for the legal performance of which a license is required, nor does plaintiff assume any of the duties of a customs house broker. It is a personal contract between the plaintiff and defendant with reference only to the fees arising from such employment. * * *

"The character of the employment of a customs house broker is private, as distinguished from public. His intervention is not necessary in the importation of goods. The importer may make his own entry, or may employ any broker who has a license. The broker is paid by the importer, and is, as a matter of fact, his agent for the single transaction or entry. He performs no duties on behalf of the public, and the public is not concerned about his fees. There are no considerations of public policy intervening which would affect the disposition of his earnings. His services stand upon no other basis than any other private employment.

"While exception is made in the salaries of public officers and certain fiduciary officers, it is settled that an assignment of wages or earnings to be earned in the future, when coupled with an interest by virtue of a subsisting contract of employment, is valid. *Rodijkeit* v. *Andrews*, 5 L. R. A. (N. S.) 565 (74 Ohio St. 104).

"If the contract between the plaintiff and defendant be considered an assignment, it would appear to be valid under the above decision, as it does not come within the excepted class.

"But, in my judgment, the transaction more prop-

erly falls within the general rule that, all the time and labor of the employee belongs to the employer during the hours of service and the master is entitled to the earnings of the servant earned outside his employment during such hours. While there are numerous exceptions to this rule, it is recognized that an express contract to that effect is valid and enforceable. 26 Cyc. p. 1020; *Barber* v. *National Carbon Co.,* 5 L. R. A. (N. S.) 1154 (129 Fed. 370).

"A corporation has within the express or implied powers of its charter the same authority to contract as has a natural person. It has the right to employ servants and to contract with them as to their duties and compensation. In the case at bar, then, under the authorities above stated, the contract at issue is valid, and the plaintiff is entitled to recover the withheld brokerage fees unless such a contract is *ultra vires,* express and implied, of a railroad corporation. * * *

"The rule as now stated, upon the doctrine of *ultra vires,* is as follows:

" 'The implied powers of a corporation are not limited to such as are indispensably necessary to carry into effect those expressly granted, but comprise all that are necessary, in the sense of being appropriate, convenient and suitable, for such purposes, including the right of a reasonable choice of means to be employed.' 10 Cyc. p. 1097.

" 'Whatever may fairl. be regarded as incidental to, and consequential upon, the things which are authorized by the charter of a corporation, will not be held by judicial construction to be *ultra vires,* unless expressly prohibited.' 10 Cyc. p. 1098; *Jacksonville, etc., Navigation Co.* v. *Hooper,* 160 U. S. 514.

"Thus, while the railroad company would not be entitled to engage in the independent operation of a hotel or the maintenance of a warehouse for the storage of goods, it may provide hotels and eating houses and elevators when they are reasonably connected with the comfort of passengers and employees, or the convenience of shippers over the company's lines. *Western Maryland R. Co.* v. *Hotel Co.,* 2 L. R. A. (N. S.) 887, note (102 Md. 307); *Louisville Property Co.* v. *Commonwealth,* 38 L. R. A. (N. S.) 830 (146 Ky. 827).

"The rule prevailing in Michigan is stated in *Ely* v. *Oakland Circuit Judge,* 162 Mich. 466, 471:

" 'The doctrine of *ultra vires* cannot be applied to contracts not prohibited, either expressly or by necessary implication, in the statute.'

"In *Timm* v. *Brewing Co.*, 160 Mich. 371, it was held that a brewing company may further its business by giving a bond to secure sureties on a liquor dealer's bond of one of its customers, and the contract is not *ultra vires*, nor outside the scope of its business. The court there said:

" 'Under the well settled rule, the defendant had implied power to do those things necessary and helpful to the conduct of its authorized business.' "

See *United States Brewing Co.* v. *Dolese & Shepard Co.*, 47 L. R. A. (N. S.) 898 (259 Ill. 274), note.

"There is nothing immoral, criminal nor *malum prohibitum* in the contract in question. The plaintiff abnegates none of its public duties, and as the contract affects only the parties to it, no considerations of public policy enter into the agreement. It is not expressly prohibited by plaintiff's charter, nor can there be said to be an implied prohibition unless the contract amounts to such a departure from the statutory business of the plaintiff as to be a perversion of its legal functions.

"It is undoubtedly the law that if the employment of a customs broker were so entirely unconnected with the business of the plaintiff as to amount to an entirely independent undertaking, apart from the purpose of a corporation, the plaintiff could not enter into such a contract.

"The agreed statement of facts recited:

(IV)  " 'It has been the custom of the company to a very large extent to facilitate such shipments (over its own line or over the Soo line, with which it maintains a joint freight office at Sault Ste. Marie), to have its local freight agent or chief clerk in the local freight office, act as customs broker.'

"The business of plaintiff under its charter is the carrying of passengers and the transportation of merchandise. In furtherance of such business it has the right to maintain with the Soo Line a joint freight office under such arrangements as may be agreed upon.

The primary effect of defendant's employment was to continue his service as chief clerk. So much of the contract was entirely within the authority of the plaintiff. In addition to this, defendant's employment as a customs broker so far as it pertained to goods shipped over plaintiff's road, operated for the convenience of its shippers and the facilitation of its freight service, was thus directly connected with the express business of the plaintiff to transport goods, and was within its implied powers to help its authorized business. * * *

"But aside from the proposition of whether the contract was *ultra vires*, no matters of public policy being involved, it is the rule that where a contract has been performed on one side, the other party is estopped from setting up the defense of *ultra vires*. The rule operates not only as against the corporation, but also in favor of the corporation as against the other party. 10 Cyc. p. 1160.

" 'Parties may also be estopped in some cases, from disputing the validity of a corporate contract when it has been fully performed on one side, and when nothing short of enforcement will do justice. To quote the language of Comstock, C. J., in *Parish* v. *Wheeler*, 22 N. Y. 494, 508:

" ' "The executed dealings of corporations must be allowed to stand for and against both the parties, when the plainest rules of good faith so require." ' *Day* v. *Buggy Co.*, 57 Mich. 151.

" 'The plea of *ultra vires* should not as a general rule prevail, whether interposed for or against a corporation, when it would not advance justice, but, on the contrary, would accomplish a legal wrong.' *Timm* v. *Brewing Co.*, 160 Mich. 371, 374.

"See, also, cases cited in plaintiff's brief, and *Blackwood* v. *Chamber of Commerce*, 178 Mich. 321, 324.

"The contract at bar was fully understood by the parties. It was performed in all respects for six years. Defendant has received certain raises in salary, and relief from other duties on account of his work under the contract. He performed his work thereunder on the time which belonged to the plaintiff and which the plaintiff paid him for. That he fully recognized his obligation to turn over the brokerage fees to the plaintiff is shown by the surreptitious manner in which he retained them. The contract has been fully performed

by the plaintiff.  All obligations have been fulfilled except those of the defendant.  Justice would not be served by permitting defendant to retain all the benefits of a performance of the contract by the plaintiff and all the benefits of a breach of it by himself.  He is estopped from now claiming the contract to be *ultra vires.*"

Judgment having been entered upon the verdict, the defendant entered a motion for a new trial based upon the following reasons:

1. The court erred in holding that plaintiff was entitled to recover from defendant the fees which he had earned as a customs broker.

2. The court erred in holding that it was not *ultra vires* for plaintiff to hire a man and require him to do the customs brokerage business.

3. The court erred in holding that there was a consideration for the claimed contract requiring defendant to turn over his customs brokerage fees.

4. The court erred in rendering judgment for plaintiff when the testimony shows that the Minneapolis, St. Paul & Sault Ste. Marie Railway Company was equally interested with plaintiff, and was not a party.

The trial court filed its reasons for denying said motion, and in disposing of the fourth reason the following was said:

"The court did not err in rendering judgment for the plaintiff, as claimed in the fourth ground of the motion to set aside judgment, because it appears from the statement of facts that the contract made with the defendant for the accounting for his brokerage fees was made by the plaintiff and all of the dealings of the defendant relative to such brokerage fees were had with the plaintiff.

"The arrangement made between the plaintiff and the Minneapolis, St. Paul & Sault Ste. Marie Railway Company are of no consequence in determining the liability of the defendant to the plaintiff for such fees. The question of the interest of the M., St. P. & S. S. M. Ry. Co. in this suit was first presented in the present motion.  Aside from the question of its not

being of any consequence in this cause, it appears to the court that the non-joinder should have been raised in a different way."

Defendant duly excepted to the denial of the motion, and has brought the case here upon writ of error; and error is assigned upon the several rulings discussed.

In this court it is not claimed by defendant that he was a public officer; but it is his contention that there was no contract entered into between himself and the plaintiff, which would constitute a legal assignment of his fees. And that if there was a contract entered into it was *ultra vires,* because a railroad company cannot enter into a customs brokerage business.

In passing the question of a public officer, it may be said that upon its facts, the instant case is readily distinguished from the case of *Bailey* v. *Quarry Co.,* 166 Mich. 321, where the salary of a postmaster was involved.

We are of the opinion that the cases cited by defendant relating to the contract and the rule governing assignment of his fees or earnings, do not apply to the facts here shown. It is rather a case where an agreement was made as to the manner in which fees earned by defendant should be disposed of, and therefore not void as against public policy. *McGregor* v. *McGregor,* 130 Mich. 505, and cases there cited. If the rule there stated could apply to a public officer, much more is it applicable here.

We agree with the learned circuit judge that the transaction in the instant case, "more properly falls within the general rule that all the time and labor of the employee belongs to the employer during the hours of service," especially where, as in the instant case, "the defendant promised to remit such fees as were earned by him as customs broker, and this agreement has never been changed." In our opinion there is no question of public policy here involved. We have ex-

amined *Deaton* v. *Lawson*, 2 L. R. A. (N. S.) 392 (40 Wash. 486), *State* v. *Norton*, 67 Iowa, 641, and kindred cases cited by defendant, but do not think them pertinent here.

It is manifest that the contract in question contained no engagement on the part of the plaintiff to do anything, for which a license was required. It assumed none of the duties of a customs broker. The contract was between the plaintiff and the defendant with reference to the disposition of the fees arising from such employment.

If it were to be held that the contract amounted to an assignment, it was valid.

"An assignment of wages to be earned in the future, under an existing contract, is valid." *Rodijkeit* v. *Andrews, supra,* and cases cited, including Michigan cases.

Upon the subject of *ultra vires,* we do not deem it necessary to add to what was said by the learned circuit judge in his charge, except to note the fact that the defense of *ultra vires* was not pleaded in the instant case. See collection of Michigan authorities upon the subject, as well as upon the general doctrine applicable to like situations, in *Blackwood* v. *Chamber of Commerce,* 178 Mich. 321.

An examination of the authorities cited and of the charge of the court, satisfies us that there is no error in the record, and the judgment below is affirmed with costs to appellee.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred. KUHN, J., did not sit.