UNION BROKERAGE COMPANY v. NORMAN G. JENSEN AND ANOTHER.[1]

May 14, 1943.

No. 33,388.

[1]Reported in 9 N. W. (2d) 721.

*A. D. Bornemann, Robert W. Palda,* and *Bundlie, Kelley & Finley,* for appellants.

*Leonard Eriksson, L. L. Drill,* and *James S. Eriksson,* for respondent.

YOUNGDAHL, JUSTICE.

Plaintiff, a North Dakota corporation, brought this action to recover from defendants certain profits resulting from their operation of a customhouse brokerage business at the port of Noyes, Minnesota. The action was tried to the court, and defendants appeal from an adverse judgment for $12,567.16 entered pursuant to findings and order for judgment.

On September 6, 1938, and for some time prior thereto, plaintiff and defendant Jensen, both duly licensed customhouse brokers, conducted their separate brokerage businesses at the port of Portal, North Dakota. On that date a written agreement was entered into between them which provided, among other things, that Jensen, in consideration of receiving 25 shares of the capital stock of plaintiff at a par value of $100 per share, would turn over to plaintiff his personal brokerage business at Portal and thereafter refrain from engaging in any competing brokerage business, and that he would generally devote his time, effort, and ability to the best interests of plaintiff, with due regard for his fiduciary relationship thereto. Jensen was elected president and treasurer of plaintiff at a salary of $250 per month. Because of his knowledge of the technical rules and regulations governing the customhouse brokerage business and his practical experience therewith,

Jensen assumed management and control of plaintiff. His close personal supervision of this business is further indicated by the fact that the remaining shares of the capital stock in plaintiff, with the exception of one share nominally held by Harry O. Kramer to qualify him as a member of the board of directors, were held by Mrs. Annie Kramer and Mrs. Nan Anderson, both of whom were unfamiliar with the business and who, through lack of experience and knowledge thereof, were incapable of directing corporate affairs.

Plaintiff and Jensen were each licensed as customhouse brokers pursuant to the provisions of the federal Tariff Act of 1930, § 641, as amended, 19 USCA, § 1641, and by virtue of these licenses were privileged to conduct the business of customhouse brokers within the confines of a designated geographic area known as District No. 34, comprising the states of North Dakota, South Dakota, and Kittson county, Minnesota, in which latter county is located the town of Noyes. Section 641(a) of the Tariff Act (19 USCA, § 1641[a]) provides, in substance, that no license shall be granted to any corporation, association, or partnership unless licenses as customhouse brokers have been issued to at least two members of the partnership or two of the officers of the corporation or association, and such licenses are in force. Jensen's license to act as a customhouse broker became one of the two licenses necessary to carry on plaintiff's business. The other license was issued to Harry O. Kramer, son of stockholder Mrs. Kramer, who during substantially all the time here pertinent acted as secretary of plaintiff.

The major portion of the tonnage passing through the port of Portal, North Dakota, from Canada into the United States, was by rail. The Canadian Pacific Railway (hereinafter referred to as the C. P. R.) had a terminal at Portal, as did the Minneapolis, St. Paul & Sault Ste. Marie Railway (hereinafter referred to as the Soo Line), thereby effecting a junction of the two lines at that point over which continuous rail shipments might be made. Shipments of merchandise arriving at a port of entry must be declared

as to contents and value, duly inspected by agents of the collector of customs at that port, and the prescribed tariff paid on dutiable items. The customhouse broker, for an agreed compensation, performs this service for the benefit of the shipper or importer of goods. He receives from the carrier the bills of lading covering the shipments and presents these, together with other documents peculiar to the business, to the collector of customs, who estimates the duty to be paid thereon. This sum is advanced by the broker for his client, the shipper. This service, of necessity, involves a working knowledge of the rules and regulations of customs law, as well as sufficient information to enable the broker to set up and maintain proper books and records in conformity with federal requirements relating to customhouse brokers. In order that a broker may be in a position to render this service to a shipper, it is first necessary that the particular shipment be consigned to a specific broker. A responsibility rests upon the common carrier of goods to deliver them to none other than the consignee named in the bill of lading. Too, unless the proper consignee presents the bill of lading to the customs officers for payment of duty, payment is refused.

About July 1, 1940, the C. P. R. gave notice that thereafter shipments of merchandise from Canada into the United States through the port of Portal, North Dakota, would be rerouted via and cleared at the port of Noyes, Minnesota. By this change, the railroad apparently was able to profit from a longer freight haul across the state of North Dakota. Obviously, unless plaintiff could follow the business to Noyes, it was about to suffer serious loss. Noyes, Minnesota, is located within District No. 34, and the brokerage licenses of plaintiff and Jensen, respectively, covered the entire area. Although the evidence is somewhat conflicting as to plaintiff's knowledge of this contemplated change, it does appear, however, that Jensen, without fully advising the officers and board of directors of plaintiff, opened up an office at Noyes with the aid and assistance of one Rime, his codefendant herein, to whom he

gave a power of attorney, and proceeded to conduct the new business as his own solely for personal profit and gain.

Following the rerouting of shipments through the port of Noyes rather than Portal, North Dakota, many of plaintiff's Canadian clients continued to consign merchandise to plaintiff for clearance through the port of Noyes and to designate plaintiff's name specifically as consignee in their bills of lading. Apparently Jensen conceived the idea that he might avail himself of this business on his personal account, provided he could successfully change or have changed the bills of lading so as to designate himself, personally, as broker consignee. He accomplished this by a letter addressed to the chief clerk of the Soo Line at Noyes under date of June 29, 1940, in which he requested the clerk to deliver to his (Jensen's) agent, Rime, all bills of lading and invoices for shipments to be cleared through customs by Jensen or by plaintiff. The employes of the Soo Line at Noyes obviously believed that Jensen was acting on behalf of plaintiff and did not question his authority to make the foregoing request, with the result that bills of lading specifically naming plaintiff as consignee for the purposes of clearance were delivered to Jensen, or to his agent, Rime. These bills of lading were then presented to certain employes of the C. P. R. at Emerson, Manitoba, which is across the border on the Canadian side and the corresponding port of exit, for the proposed alterations to be made in the name of the consignee. These employes were obviously unaware of the true situation, and by the use of a rubber-stamp signature of Jensen they either restamped so as to change the name of the consignee from plaintiff to Jensen or permitted Rime to do so under color of Jensen's authority. The evidence is vague and uncertain as to the actual mechanics of the change, but in any event it was made and Jensen was thereby in a position to present the altered bills of lading, specifically designating himself as customhouse broker, to the collector of customs, pay the duty thereon, and collect the brokerage fee for his services.

When plaintiff became aware of Jensen's operations at Noyes he was pressed for an explanation. This he supplied by advising

plaintiff that an agreement had been previously effected between plaintiff and one Mackay, another customhouse broker operating at the port of Noyes, by the terms of which plaintiff had agreed not to seek any business at Noyes in consideration of Mackay's not soliciting business at the port of Portal. Mackay testified on behalf of plaintiff, denied the existence of such an agreement, and vehemently denied informing Jensen that there had been such an agreement. Jensen further informed plaintiff that the business at Noyes was losing money and that the revenue was scarcely sufficient to pay the office personnel. It seems that plaintiff relied upon this explanation until September 1940. By that time the relationship between plaintiff and Jensen had become strained because of other personal differences not here material. A meeting of the board of directors of plaintiff was called in the office of plaintiff's attorney, and Jensen was requested to resign his office, which he did.

Shortly thereafter and in the first part of December 1940, plaintiff opened a customhouse brokerage business at Noyes in competition with Jensen and has continued to operate such business ever since that time. This action for recovery of profits made by Jensen in his operations at Noyes was brought on the theory that such profits accrued to plaintiff as a matter of right by virtue of a constructive trust, since Jensen from the beginning of his operations at Noyes was an officer of plaintiff, receiving a salary therefrom, and charged with certain fiduciary responsibilities; that in fact much of the business procured by Jensen was business intended for plaintiff by reason of the fact that the shippers specifically designated plaintiff as the broker at Noyes to clear the shipments, and that Jensen fraudulently changed or had changed the bills of lading covering these shipments so that he personally was permitted to clear them and receive the fees therefrom.

Jensen admitted that the bills of lading were altered as charged, but contended that it was done pursuant to the shippers' instructions; that the agreement of September 6, 1938, between him and plaintiff was void under North Dakota statute; and, further, that

witness Mackay did advise him and actually read to him the reciprocal agreement between plaintiff and Mackay to the effect that plaintiff would not seek business at the port of Noyes in consideration of Mackay's refraining from soliciting business at the port of Portal. Jensen further asserted that the action should be dismissed because plaintiff had not obtained a certificate of authority as a foreign corporation doing business in this state. The court found that plaintiff was not doing business in this state but was engaged in interstate commerce and therefore was not required to obtain a certificate of authority; that Jensen in his fiduciary capacity as the active officer of the corporation broke faith with the stockholders in establishing his own business at Noyes and converted plaintiff's business by a change in the bills of lading; that a constructive trust was created in plaintiff's favor; and that plaintiff was entitled to recover of Jensen the sum of $10,324.80 and from defendant Rime the sum of $2,242.36.

Defendants' numerous assignments of error may be grouped together so as to present the following issues for consideration on this appeal:

(1) Did the trial court err in holding that plaintiff was engaged in interstate or foreign commerce and not amenable to Minn. St. 1941, § 303.20 (Mason St. 1940 Supp. § 7495-20).

(2) Was the validity of the September 6, 1938, contract between plaintiff and Jensen an issue in the case so as to require a finding that it was illegal and void.

(3) Was the court justified in finding that a fiduciary relationship existed between plaintiff and Jensen, thereby creating a constructive trust in plaintiff's favor for the profits here sued for.

(4) Did the evidence justify the finding that Jensen breached his fiduciary obligation to plaintiff by secretly operating the customhouse brokerage business at Noyes for his personal benefit.

(5) Should the profits awarded to plaintiff, in any event, be limited to November 5, 1940, rather than November 30, 1941, the time of trial.

(6) Was there error in awarding judgment against Rime for $2,242.36.

(7) Did the court err in requiring defendants to turn over to plaintiff all books and records relating to the business at Noyes.

(8) Was Jensen entitled to an offset in the amount of salary earned.

Defendants' first assignment of error raises the question of the power of the state of Minnesota to require plaintiff, by statutory regulation, to obtain a certificate of authority before bringing an action in the courts of this state. Minn. St. 1941, § 303.20 (Mason St. 1940 Supp. § 7495-20), insofar as here material, provides:

"No foreign corporation transacting business in this state without a certificate of authority shall be permitted to maintain an action in any court in this state until such corporation shall have obtained a certificate of authority."

Plaintiff is a North Dakota corporation and has not complied with this requirement. The lower court found "that the customhouse brokers, involved herein, are established as federal instrumentalities and are engaged in interstate commerce in facilitating the free flow of commerce between the United States and the Dominion of Canada."

Defendants contend that this was error; that plaintiff is not a federal instrumentality engaged in interstate commerce; that the business of plaintiff is purely local and intrastate in character, and, if it affects interstate commerce at all, it does so only indirectly and as an aid and facility of such commerce; that plaintiff is therefore subject to the requirements of the statute and the case should have been dismissed by the lower court.

Plaintiff asserts that the finding was proper; that, inasmuch as its business is so closely related to and directly affects interstate commerce, it is entitled to the privilege of immunity from state regulatory power under U. S. Const. art. I, § 8, which reserves to congress the right to regulate commerce between the states and foreign nations; that it was not doing business within the state

within the meaning of the statute and hence not amenable to the requirements thereof. We consider this issue first, inasmuch as a determination thereof adversely to plaintiff disposes of the appeal without the necessity of considering the other issues presented by defendants' assignments of error.

It is well settled that a state may impose such restrictions as it sees fit as a prerequisite to a foreign corporation coming into the state to do business. Bank of Augusta v. Earle, 38 U. S. (Pet.) 519, 588, 10 L. ed. 274; Lafayette Ins. Co. v. French, 59 U. S. (How.) 404, 15 L. ed. 451; Paul v. Virginia, 75 U. S. (Wall.) 168, 19 L. ed. 357; Railway Exp. Agency, Inc. v. Virginia, 282 U. S. 440, 51 S. Ct. 201, 75 L. ed. 450, 72 A. L. R. 102. Equally well settled, however, is the limitation on the state's right to exclude foreign corporations from doing business within the state within the meaning of U. S. Const. art. I, § 8, where the business has a substantial relation to interstate commerce. The control of congress over interstate business is exclusive. Gibbons v. Ogden, 22 U. S. (Wheat.) 1, 6 L. ed. 23. Any attempt on the part of the states to regulate or interfere with such commerce is void. Crutcher v. Kentucky, 141 U. S. 47, 11 S. Ct. 851, 35 L. ed. 649; Western Union Tel. Co. v. Kansas, 216 U. S. 1, 7, 30 S. Ct. 190, 54 L. ed. 355. Statutes similar to the one here invoked by defendants have usually been held to place an undue burden on interstate commerce and hence to be unconstitutional as to foreign corporations engaged in interstate business. Davis v. Farmers Co-op. Equity Co. 262 U. S. 312, 43 S. Ct. 556, 67 L. ed. 996; Sioux Remedy Co. v. Cope, 235 U. S. 197, 35 S. Ct. 57, 59 L. ed. 193. The conflict arises in the application of these rules to the facts and circumstances in each particular case and in the determination of the issue of whether the business involved is intrastate in character or has such a vital and substantial relation to commerce as to constitute it interstate business under the commerce clause of the constitution.

Probably no subject in the field of law has created greater ambiguity and confusion among text writers and in court opinions

than the interpretation of the commerce clause of the constitution. Because the determination of whether a business is interstate or intrastate commerce is so essentially a federal question, we necessarily look to the decisions of the United States Supreme Court for the broad controlling principles upon which this decision must rest. Palm Vacuum Cleaner Co. v. Bjornstad, 136 Minn. 38, 161 N. W. 215, L. R. A. 1917C, 1012. There has not always been uniformity in the federal decisions even with respect to the general principles to be followed. 4 Missouri L. Rev. 207; Wickard v. Filburn, 317 U. S. 111, 63 S. Ct. 82, 88, 87 L. ed. .... In the Wickard case the court exhaustively discusses this matter and, in considering many prior decisions, says (317 U. S. 122, 63 S. Ct. 88, 87 L. ed. ...):

"In some cases sustaining the exercise of federal power over intrastate matters the term 'direct' was used for the purpose of stating, rather than of reaching, a result; in others it was treated as synonymous with 'substantial' or 'material'; and in others it was not used at all. Of late its use has been abandoned in cases dealing with questions of federal power under the Commerce Clause."

In Santa Cruz F. P. Co. v. National L. R. Board, 303 U. S. 453, 466, 58 S. Ct. 656, 660, 82 L. ed. 954, Mr. Chief Justice Hughes, indicating the difficulty of adopting rigid formulas and the use of the words "direct" and "indirect," uses this language:

"* * * 'direct' has been contrasted with 'indirect,' and what is 'remote' or 'distant' with what is 'close and substantial.' Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek for mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution such as 'interstate commerce,' 'due process,' 'equal protection.' "

Similarly, in the Wickard case, 317 U. S. 111, 124, 63 S. Ct. 82, 87 L. ed. ..., *supra,* the court states that the mechanical applica-

tion of legal formulas is no longer feasible. Thus we observe the confusion that has resulted in an attempt to define interstate commerce, but the greater difficulty has arisen in attempting to apply the general principles to the factual situation in each case. It may generally be said, however, that in view of the grant of power by the constitution to congress to regulate interstate commerce, such grant, without any action by congress, prevents the states from exercising any direct control thereof with relation to the subjects embraced within its purview and that the grant is of such a nature as to require that, if there is any regulation, it should be prescribed by the single authority. Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18; Southern Express Co. v. Byers, 240 U. S. 612, 36 S. Ct. 410, 60 L. ed. 825, L. R. A. 1917A, 197. Where a subject is national in its character, involves a matter of public policy, and requires uniformity of regulation, congress alone has the prerogative to provide the needed regulations. Louisiana P. S. Comm. v. Texas & New Orleans R. Co. 284 U. S. 125, 52 S. Ct. 74, 76 L. ed. 201; Missouri P. R. Co. v. Stroud, 267 U. S. 404, 45 S. Ct. 243, 69 L. ed. 683; York Mfg. Co. v. Colley, 247 U. S. 21, 38 S. Ct. 430, 62 L. ed. 963, 11 A. L. R. 611; Wickard v. Filburn, *supra*. The fact that congress has been silent in such a case has been held to be a declaration that the particular commerce should be free from regulation. Sanitary District v. United States, 266 U. S. 405, 45 S. Ct. 176, 69 L. ed. 352; Missouri ex rel. Barrett v. Kansas N. G. Co. 265 U. S. 298, 44 S. Ct. 544, 68 L. ed. 1027; Covington and C. Bridge Co. v. Kentucky, 154 U. S. 204, 14 S. Ct. 1087, 38 L. ed. 962. Despite this well defined power of congress over strictly interstate commerce, it cannot be extended so as to include regulatory control over a business which has no substantial relation to such commerce and does not involve a question of national concern. To permit such control would be voluntarily to eliminate the distinction between what is national and what is local and create a completely centralized government. National L. R. Board v. Jones & Laughlin Steel Corp. 301 U. S. 1, 57 S. Ct. 615, 81 L. ed. 893, 108

A. L. R. 1352. It is clear, therefore, that the power of congress is paramount in the field of interstate commerce and in matters which affect national public policy and require uniformity of regulation. It is equally clear, however, that this power does not extend to cases where the business is local or intrastate. Schechter Poultry Corp. v. United States, 295 U. S. 495, 55 S. Ct. 837, 79 L. ed. 1570, 97 A. L. R. 947; National L. R. Board v. Jones & Laughlin Steel Corp., *supra;* Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18, *supra.*

The greatest difficulty does not arise in these two classes of cases where it appears reasonably clear that the business is either strictly local and has no connection whatever with interstate commerce or where the business is of an interstate character and a matter of national concern. The real problem is presented in those situations where the business may to some extent affect interstate commerce, where congress has not seen fit to regulate, and where no question of national public policy is involved. In that group of cases the line of demarcation cannot always be clearly drawn. But a case must necessarily fall within one class or the other, depending upon how substantially the commerce has been affected. The question must be determined upon the particular circumstances and rights involved in each situation. Hall v. DeCuir, 95 U. S. 485, 24 L. ed. 547. In the recent case of Cohn-Hall-Marx Co. v. Feinberg, 214 Minn. 584, 8 N. W. (2d) 825, this court held that whether the business in question was one having the attributes of interstate commerce or intrastate commerce was a question of fact. In such doubtful cases the fact that a business is local in character is an important factor for consideration. The following language, found in Wickard v. Filburn, 317 U. S. 111, 124, 63 S. Ct. 82, 89, 87 L. ed. . . . , *supra,* is pertinent here:

"That an activity is of local character may help in a doubtful case to determine whether Congress intended to reach it. *The same consideration might help in determining whether in the ab-*

*sence of Congressional action it would be permissible for the state to exert its power on the subject matter, even though in so doing it to some degree affected interstate commerce.* \* \* \* it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.' " (Italics supplied.)

In this group of cases where no substantial effect upon the commerce appears, absent congressional regulation, the states are free to act. When congress does act, however, the exercise of its authority overrides all conflicting state regulation where the exercise of such power has a real or substantial relation to some part of the commerce itself. Minnesota Rate Cases, *supra;* Second Employers' Liability Cases (Mondou v. N. Y. N. H. & H. R. Co.), 223 U. S. 1, 32 S. Ct. 169, 56 L. ed. 327, 38 L.R.A.(N.S.) 44; Atlantic Coast Line R. Co. v. Riverside Mills, 219 U. S. 186, 31 S. Ct. 164, 55 L. ed. 167, 31 L.R.A.(N.S.) 7. If the effect of intrastate transactions under interstate commerce is only remote and does not encroach substantially thereon, such transactions remain within the province of state power. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Minnesota Rate Cases, *supra;* Covington and C. Bridge Co. v. Kentucky, 154 U. S. 204, 14 S. Ct. 1087, 38 L. ed. 962, *supra;* Adair v. United States, 208 U. S. 161, 28 S. Ct. 277, 52 L. ed. 436, 13 Ann. Cas. 764.

The law applicable to this vexatious and difficult problem is summarized by Mr. Chief Justice Stone in the case of United States v. Wrightwood Dairy Co. 315 U. S. 110, 119, 62 S. Ct. 523, 526, 86 L. ed. 726, in the following language:

"The commerce power is not confined in its exercise to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execu-

tion of the granted power to regulate interstate commerce. \* \* \* The power of Congress over interstate commerce is plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. \* \* \* It follows that no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. *Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power."*

The ultimate question in the instant case then is: Did the customhouse brokerage business conducted by plaintiff *in a substantial way interfere with or obstruct the exercise of the granted power of congress to regulate interstate commerce.*

In applying this principle so recently enunciated by the Supreme Court of the United States to the facts here presented, it is necessary to consider the character of the business in which plaintiff was engaged. Customhouse brokers are not public officers but perform purely personal services as agents of the shippers. Duluth S. S. & A. Ry. Co. v. Wilson, 200 Mich. 313, 167 N. W. 55, L. R. A. 1918E, 763; People ex rel. Tower v. State Tax Comm. 282 N. Y. 407, 26 N. E. (2d) 955; State v. Wm. J. Oberle, Inc. 190 La. 1053, 183 So. 347. True, under the tariff act, customhouse brokers are required to be licensed in order to do business, but the sole purpose of that requirement is to protect the collection of tariffs due the federal government. State v. Wm. J. Oberle, Inc. *supra.* The office of plaintiff was situated in Noyes, Minnesota, and all of its records pertaining to that business were kept there. The business was transacted entirely within the borders of this state. It had nothing whatever to do with the actual importation or exportation of articles of commerce. Its duty as an agent of the shipper was merely to pay the customs duties and make settlement subsequently with its principal, the shipper. Customhouse brokers represent private persons. They receive no fees or emoluments from the federal government. A customhouse broker's license authorizes

the holder to transact business in certain customs collection districts. He cannot represent a claimant before the treasury department unless enrolled as attorney or agent in conformity with the requirements of the department. We think this quite far removed from being an agent of the United States, or being engaged in a governmental function. It is urged that because the customhouse broker pays the duties he has a direct and substantial connection with the commerce; that the commerce would be delayed if the duties were not paid. It must be borne in mind, however, that under the tariff act the shipper himself or his agent can perform this service. Article 1411, Custom Regulations of 1937, provides in part:

"(a) An importer or exporter transacting customs business solely on his own account and in no sense on behalf of another is not required to be licensed, nor are his authorized regular employees or officers who act only for him in the transaction of such business."

The broker acts as an independent contractor to perform this personal service for the shipper. He does not come into contact with the commerce itself in any way insofar as its actual movement is concerned. He is at the most an aid or facility to the commerce and but remotely, if at all, affects it. We fail to see how such broker is an instrumentality of the commerce. Therefore, it seems to us that the statutory requirement is not an obstruction or interference with interstate commerce.

Plaintiff relies upon the case of Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. ed. 735, 23 A. L. R. 229, in support of its position that the business here in question is interstate commerce. We believe that case to be distinguishable upon the facts. There congress had definitely exercised its prerogative to legislate concerning a matter of national public concern and public policy. There had developed considerable abuse in the shipping and packing house industry, and congress saw fit to eliminate these abuses by appropriate legislation. The commission men in the Wallace

case had actual contact with the movement of the commerce itself, and it was clearly a matter of interstate concern affecting all of the states alike. In the instant case, the matter of public policy or public concern is not involved. The customhouse brokerage business is purely a private business conducted for personal profit. Congress has merely provided that such brokers shall be licensed before doing business in order to insure the collection of the tariff owing the United States. We therefore feel that the Wallace case is not in point here.

While the case of Puget Sound Stevedoring Co. v. State Tax Comm. 302 U. S. 90, 58 S. Ct. 72, 82 L. ed. 68, is not squarely in point, we believe that that phase of it having to do with the furnishing of employes to the steamship companies for stevedoring duties where the company did not exercise any control or direction over their duties is more closely analogous. In that case the court determined that where the stevedoring corporation furnished the laborers and retained supervision and control over their activities, where they actually assisted in loading and unloading the articles of commerce, such activity was interstate commerce; but that if these employes had been furnished to the steamship companies without supervision or direction, then there was no direct relation to the commerce and the employer would be but an independent contractor. Similarly, the customhouse broker, in paying the duties, is but an independent contractor under his contractual relationship with the shipper. State v. Wm. J. Oberle, Inc. 190 La. 1053, 183 So. 347, *supra.*

Although the United States Supreme Court has not passed directly on the precise question here presented, the supreme court of Louisiana has had occasion to consider it. In a well reasoned opinion it has held that the business of a customhouse broker is intrastate rather than interstate in character. State v. Wm. J. Oberle, Inc. *supra.* There the state of Louisiana sought to impose upon defendant, a customhouse broker, an occupational license tax, and contended that the defendant was engaged in a purely private business and subject to the general tax. The defendant asserted

that he was a customhouse broker, duly licensed by the secretary of the treasury of the United States, and could not be subjected to such a tax (190 La. 1055, 183 So. 347), "as to do so would unconstitutionally burden 'a purely Federal and quasi Federal function' * * * and would interfere 'with the commerce laws of the United States and particularly with the importation and exportation of commerce.'" In considering the nature of defendant's business, the court said (190 La. 1058, 183 So. 348):

"We fail to see wherein the occupational license tax to which the State seeks to subject defendant, as a customhouse broker, would interfere 'with the commerce laws of the United States and particularly the importation and exportation of commerce', as contended by defendant. The evidence fails to show that defendant is engaged in either. Defendant receives its business from importers of merchandise, private persons. * * * Defendant is not itself an importer of merchandise. If it were, it would not be licensed as a customhouse broker."

And further (190 La. 1059, 183 So. 348):

"The State in this case is not demanding that defendant pay an occupational license tax as an importer, but only on its receipts, as customhouse broker, from importers of merchandise, private persons, a purely local business."

Fortifying the conclusion that customhouse brokerage business is intrastate rather than interstate is the case of People ex rel. Tower v. State Tax Comm. 282 N. Y. 407, 26 N. E. (2d) 955. Although in that case this issue was not directly involved, the court, in holding that the business was subject to a professional tax, inferentially held that it was doing business within the state and amenable to state regulation and therefore not engaged in interstate commerce. See also Duluth S. S. & A. Ry. Co. v. Wilson, 200 Mich. 313, 167 N. W. 55, L. R. A. 1918E, 763, wherein the customhouse broker was held not to be a public officer. Significant in the instant case is the fact that the treasury department, under

date of April 20, 1936, issued a regulation, § 6 of which in part provides (Art. 1410, Customs Regulations of 1937):

"However, a licensee having a license in force in one district may on application to the Committee be granted a license to transact business in another district without further examination, provided it appears on investigation that the licensee is authorized to do business in the State or States in which such other district is situated, and is prepared and qualified to render efficient service in such other district."

Subsequent to the adoption of this regulation, congress amended the tariff act in several respects, although the provisions governing customhouse brokers have remained substantially the same. By such regulation the treasury department has placed a practical construction on the character of the customhouse brokerage business as affecting commerce. It infers that it was the opinion of the treasury department that the statutory provision requiring a certificate of authority from a foreign corporation, as relating to such business, did not encroach upon interstate commerce. The provision that brokers may qualify to do business in more than one district, provided they are authorized to do business in the particular states in which such other districts are located, definitely implies that the department considers such business truly local and intrastate; and surely, if the business is intrastate when operated in two or more districts, it is equally intrastate when operated in a single district. Inasmuch as the tariff act was revised subsequent to the regulatory provision referred to without modifying this provision, "under the established rule Congress must be taken to have approved the administrative construction and thereby to have given it the force of law." Helvering v. R. J. Reynolds Tobacco Co. 306 U. S. 110, 115, 59 S. Ct. 423, 426, 83 L. ed. 536.

Since early days when Chief Justice Marshall in Gibbons v. Ogden, 22 U. S. (Wheat.) 1, 6 L. ed. 23, so clearly set forth the principles to be applied in construing the commerce clause, there have been alternately restrictive and broad interpretations given

to this provision of the constitution. Revealing the present-day trend of the effect of state regulation upon the commerce, even where congress has legislated, is the recent case of Parker v. Brown, 317 U. S. 341, 63 S. Ct. 307, 87 L. ed. ..., discussed in 27 Minn. L. Rev. 468. When abuses creep into our national economy or where other problems arise which are of vital public concern and present issues of national public policy, it is natural and commendable that the commerce clause should be given a broad interpretation so as to sustain legislation by the congress having for its laudable purpose the elimination of abuses and the solution of these problems. As the court said in Wickard v. Filburn, 317 U. S. 122, 63 S. Ct. 87, 87 L. ed. ..., *supra:*

"Even while important opinions in this line of restrictive authority were being written, however, other cases called for the broader interpretations of the Commerce Clause destined to supersede the earlier ones, and to bring about a return to the principles first enunciated by Chief Justice Marshall in Gibbons v. Ogden, *supra.*"

While it is our duty fully to recognize this most recent trend in the construction of the commerce clause by the Supreme Court of the United States, we are unable to find, even in these recent decisions, any inclination on the court's part to interfere in purely local and intrastate matters. It is entirely consistent with these decisions and in harmony therewith for the courts, when confronted by varying factual situations involving the commerce clause, to preserve whenever possible that fine balance between national and state solidarity which has been characteristic of our government during its century and a half of existence. Where congress has not stepped into the field of regulation because of the fact that some national public policy or concern is not involved, and where the business, as here, is local in character, relates only to personal services, is conducted for private profit, and is not an instrumentality of commerce, the courts should be loathe to suggest that the state cannot enforce a reasonable regulation for the benefit of its

citizens such as the statute here in question. The provisions of this statute require foreign corporations to obtain a certificate of authority as a prerequisite to maintaining an action in the courts of this state. We believe that this is a reasonable requirement and not a hardship upon the business. Nor do we think that it is an obstruction upon the commerce itself nor an interference therewith under the facts in the instant case. On the other hand, it is a protection to the people of this state in providing for them a method for the service of process upon a foreign corporation without the necessity of going into a foreign jurisdiction to secure relief. Where the business so remotely affects the commerce, if at all, we conclude that the statutory requirement is a proper regulation for the state to prescribe, and that the constitutional power of congress is in no way impaired thereby.

Defendants' motion to dismiss the action at the close of plaintiff's case therefore should have been granted.

Reversed.

