**LOUIS N. RITTEN & COMPANY, INC., Relator,**

v.

**The COMMISSIONER OF REVENUE, Respondent.**

No. 81–638.

Supreme Court of Minnesota.

May 21, 1982.

Henry M. Grannan, Chicago, Ill., Thompson, Nielsen, Klaverkamp & James, Bruce W. Blackburn and Leon I. Steinberg, Minneapolis, for relator.

Warren Spannaus, Atty. Gen., and Paul R. Kempainen, Sp. Asst. Atty. Gen., St. Paul, for respondent.

PETERSON, Justice.

The sole issue for decision is whether Louis N. Ritten & Company, Inc. is engaged exclusively in interstate commerce, the determination of which dictates whether relator is taxable pursuant to Minn.Stat. § 290.02 (1971), the excise tax on corporations, or Minn.Stat. § 290.03(1) (1971), the income tax on corporations.

Relator filed returns in 1972, 1973 and 1974 under the assumption that it was subject to the state excise tax on corporations, Minn.Stat. § 290.02 (1971), which is based on corporate income. A deduction for interest income from United States government obligations, granted pursuant to Minn.Stat. § 290.08, subd. 8 (1971), is denied to section 290.02 taxpayers by virtue of Minn.Stat. 290.08, subd. 13 (1971). Relator filed timely claims for refund of taxes paid on interest income for the years stated on the ground that it was engaged exclusively in interstate commerce and therefore should have filed returns pursuant to Minn. Stat. § 290.03(1) (1971), the net income tax on corporations. Under the net income tax on corporations, relator's interest income from United States government obligations would have been deductible and its tax liability would have been reduced by $15,-958.26.

The Commissioner of Revenue disallowed relator's claim for refund in an order dated October 2, 1979. The disallowance was affirmed by the Minnesota Tax Court after a short evidentiary hearing, and relator now appeals by writ of certiorari.

Relator was incorporated under the laws of this state in the 1920's as a commodities futures broker. Until the 1960's, relator's only office was in Minneapolis; a second office is now maintained in Chicago. During the relevant tax years, relator employed six or seven individuals—brokers, corporate officers and support staff—at the Minneapolis office.

Relator's futures trading involves the buying and selling of standardized contracts that specify a date and price at which a commodity will be delivered. The trading takes place on the floor of an exchange, a competitive marketplace governed by rules promulgated by Congress and the federal Commodity Futures Trading Commission. A customer can have an order executed on the exchange floor by one of relator's brokers by first entering into a cash or credit transaction with relator. The credit transactions, or trades "on margin," involve depositing a downpayment with the broker, who uses the value of the futures contract as collateral for the unpaid balance. The unpaid balance or a portion thereof is subject to call by the broker in the event the commodity on the national market falls below a specified price.

Section 290.03(1)[1] imposes a net income tax on a class of taxpayers defined as

1. The segregation of corporations engaged exclusively in foreign or interstate commerce for different tax treatment has its historical roots in now-discarded interpretations of the Commerce Clause. When the state income tax scheme was created in 1933, federal courts construed the Commerce Clause as prohibiting all state excise or franchise taxes on the privilege of doing business if the taxed businesses were engaged exclusively in interstate commerce. *Alpha Portland Cement Co. v. Mass.*, 268 U.S. 203, 45 S.Ct. 477, 69 L.Ed. 916 (1925). State legislative draftsmen thereafter discovered that by avoiding the magic words "franchise" or "privilege" they could constitutionally tax these interstate businesses. *See Northwestern States Portland Cement Co. v. Minn.*, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), *aff'g* 250 Minn. 32, 84 N.W.2d 373 (1957) (upholding Minn.Stat. § 290.03 as tax on income derived from interstate commerce, not on the privilege of engaging in interstate commerce).

In *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the United States Supreme Court discarded this formalistic rule, with its emphasis on statutory wording, in favor of a rule turning on the tax statute's effect on interstate commerce. The *Complete Auto Transit* rule permits a tax on exclusively interstate business if the business has a substantial nexus with the taxing state and the tax is fairly apportioned, does not discriminate against interstate commerce and is fairly related to the services provided by the state. *Id.* at 279, 97 S.Ct. at 1079.

follows: "Domestic and foreign corporations not taxable under section 290.02 which own property within this state or whose business within this state during the taxable year consists exclusively of foreign commerce, interstate commerce, or both[.]" In determining whether relator falls within this class of taxpayers, we are bound by decisions of the United States Supreme Court relating to what constitutes interstate commerce. *City of Waseca v. Braun*, 206 Minn. 154, 165, 288 N.W. 229, 234 (1939). The fact that a business activity involves interstate commerce to a degree sufficient to permit federal regulation does not, however, justify an automatic conclusion that the activity is exclusively interstate. Our inquiry does not end with the fact that commodity futures transactions are in interstate commerce according to federal law.

Relator cites several cases in which a taxpayer has been characterized as engaged exclusively in interstate commerce. *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), *aff'g* 250 Minn. 32, 84 N.W.2d 373 (1957); *West Publishing Co. v. McColgan*, 27 Cal.2d 705, 166 P.2d 861, *aff'd*, 328 U.S. 823, 66 S.Ct. 1378, 90 L.Ed. 1603 (1946); *Owens-Illinois Glass Co. v. Commissioner of Taxation*, No. 196 (Minn.Bd. Tax App., September 24, 1946). In none of those cases, however, was the characterization of the taxpayer's business activities as "exclusively interstate" actually placed in issue. More significantly, those business activities were markedly different from the activities of relator.

In each of the cited cases, the only commercial activity by the taxpayer in the taxing state was that of the sales arm of a manufacturing, shipment and sales operation headquartered in another state. Salespersons employed by each taxpayer engaged in commercial activity that had economic significance only as it related to the

interstate sale and shipment of a product originating outside of the taxing state.

If relator was engaged exclusively in the business of selling grain and commodities grown outside of Minnesota to customers within Minnesota, then, perhaps, the cited cases would be apposite. However, relator sells a service separate and removed from the interstate shipment of grain. The services of brokers have, in other contexts, been recognized as a distinct and localized commercial activity. In *Union Brokerage Co. v. Jensen*, 215 Minn. 207, 9 N.W.2d 721 (1943), *aff'd*, 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227 (1944), the activities of a customhouse broker were found to be intrastate in character even though his services were entirely devoted to facilitating the movement of goods in foreign commerce.

> The broker acts as an independent contractor to perform this personal service for the shipper. He does not come into contact with the commerce itself in any way insofar as its actual movement is concerned. He is at the most an aid or facility to the commerce and but remotely, if at all, affects it.

*Id.* at 221, 9 N.W.2d at 728.

■ The commodities futures broker bears a similar relationship to trade in commodities. As a representative of private persons, the broker provides access to the futures exchange, thus facilitating the flow of commodities in commerce without coming into contact with the commerce itself. This service is provided pursuant to a contractual agreement entered into when a customer walks into a broker's office. The agreement includes a commission charged for the service provided and, if the customer is trading on margin, it also establishes a credit arrangement at an agreed upon interest rate. In view of these localized activities, we cannot characterize relator's business within this state as consisting exclusively of interstate commerce.

---

The inclusion of interest on United States government obligations in computing the franchise tax, but not the income tax, is the product of federal legislation which prohibits taxation of such interest except under "nondiscriminatory franchise or other nonproperty taxes in lieu thereof imposed on corporations and except estate taxes or inheritance taxes." 31 U.S.C. § 742 (1976); *see Reuben L. Anderson-Cherne, Inc. v. Comm'r of Taxation*, 303 Minn. 124, 226 N.W.2d 611, *appeal dismissed*, 423 U.S. 886, 96 S.Ct. 181, 46 L.Ed.2d 118 (1975).

The distinction drawn in *Union Brokerage* between intrastate brokerage services and the commerce it facilitates is not without support. A state license tax on a cotton futures broker was held valid in *Ware & Leland v. Mobile County*, 209 U.S. 405, 28 S.Ct. 526, 52 L.Ed. 855 (1908). The court noted with respect to those futures transactions. that were merely speculative and followed by no actual delivery that it could not be fairly contended that such contracts were the subject of interstate commerce. *Id.* at 412–13, 28 S.Ct. at 528–529. The contracts *a fortiori* cannot be the subject of *exclusively* interstate commerce. *Cf. Gaines, Silvey & Nichols, Inc. v. State Board of Tax Appeals*, 122 N.J.L. 334, 336, 5 A.2d 473, 474 (1939) (insurance broker "was not in the business of selling insurance in the strict sense because it did not have insurance to sell. It sold a service to a customer, nothing more.").

Even if found to be engaged in localized activities, relator contends that these activities do not prejudice its position on appeal because they are ancillary to relator's interstate business. The only case cited by relator which reasonably supports this theory is *Ozark Pipe Line Corp. v. Monier*, 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439 (1925), which is distinguishable on its unique facts. Ozark Pipe Line Corp., a Maryland corporation with its principal office in Missouri, operated a petroleum pipeline from Oklahoma through Missouri to a point in Illinois. The oil gathering lines were all in Oklahoma and no oil was received or delivered in Missouri. Despite the exercise of corporate powers in Missouri, and the employment of labor, ownership of property and purchase of supplies there, Ozark Pipe Line Corp. was held to be exclusively engaged in interstate commerce because all of its localized activities were in furtherance of interstate commerce. The localized activities constituted the "means and instruments" by which interstate commerce is conducted. The unique feature of Ozark Pipe Line is that the commercial activity—transporting oil from Oklahoma to Illinois—necessarily involved interstate commerce, and none of its activities had an economic effect other than to aid the operation of the pipeline. In the present case, relator's intrastate activities are not ancillary to interstate commerce; they are at the very heart of relator's business.

Affirmed.